UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT OWENSBORO

KENNETH E. STONE *et al.*                                            PLAINTIFFS

v.                                                  CIVIL ACTION NO. 4:16CV-69-JHM

CHILD PROTECTION SERVICES *et al*.                                   DEFENDANTS

## MEMORANDUM OPINION

Plaintiff, Kenneth E. Stone, a non-prisoner proceeding *in forma pauperis*, has filed this *pro se* complaint pursuant to 42 U.S.C. § 1983 (DN 1) on behalf of himself and K.S., his minor son. Rule 12(h)(3) of the Federal Rules of Civil Procedure provides, "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." As a review of the complaint reveals that this Court lacks jurisdiction over the subject matter contained therein, the Court will dismiss the action.

## I.

Plaintiff identifies the following six Defendants in this action: (1) Child Protection Services in Dixon, Kentucky; (2) the Cabinet for Families and Children in Dixon, Kentucky; (3) "FSOS" Melea Ramin in Dixon, Kentucky; (4) Social Service Worker (SSW) Ashley Campbell in Dixon, Kentucky; (5) MSW Mary Ruether in Dixon, Kentucky; and (6) SSW Andrea Caudill, a "Social Service worker and a Child Protection Services Worker." Plaintiff states that he sues Defendants Ramin and Ruether in their official capacities and that he sues the remaining four Defendants in both their official and individual capacities.

In his complaint, Plaintiff states that on August 21, 2001, he was convicted in Kentucky of two counts of sodomy and four counts of sexual abuse and was sentenced to 15-year's incarceration. "He was also sentence to a three years conditional discharge upon release from

Kentucky correctional institution."  According to Plaintiff, he completed the Sex Offender Treatment Program (SOTP) on April 20, 2009.  He states that he was released from incarceration on December 31, 2009.  "Prior to his release he was classified to a lifetime registrant and was informed of all his requirements by the Probation and Parole supervisor . . . ."

According to Plaintiff, on February 14, 2014, he decided to marry his then pregnant girlfriend and raise their child together.  Plaintiff states that on April 2, 2014, he was "convicted of Failure to comply with sex offender registry and improper use of social network" and sentenced to one year "in the Kentucky state penal system and one year county time for the improper use of social network.  However, this was probated out for 2yrs of probation."  He states that his probation was transferred to Henderson County, where he was to meet with Probation Officer Lisa Boucher.

Plaintiff's son, K.S., was born on September 8, 2014.  According to Plaintiff, sometime in September or October 2014, Probation Officer Boucher "showed up at [Plaintiff's] residence in Providence, KY, to verify his home address and found his wife had given birth to their son." Plaintiff states that on September 2, 2015, Defendant Caudill, along with a "Sheriff's dept. Officer" came to Plaintiff's home to remove K.S. from the home.  According to Plaintiff, Defendant Caudill informed Plaintiff that she had received a call about Plaintiff being a lifetime registered sex offender.  Plaintiff states that he called his probation office and spoke with a probation officer who in turn spoke with Defendant Caudill to explain Plaintiff's conviction and requirements.  Plaintiff states that no orders had been issued for him not to be around any children.  According to Plaintiff, Defendant Caudill removed K.S. from the home and wrote out a Prevention Plan (Plan) which, in part, listed the name of the person who would ensure K.S.'s safety and supervise all contact between K.S. and Plaintiff.

2

According to Plaintiff, during the year that he lived with his wife and K.S., he was an active father who participated in his child's life and "was at '100%' to development and create a bond between a father and his son.  [Plaintiff] also had done the majority of cooking and household chores."  During this year, Plaintiff states, he "complied and continues to comply with all of the registry law and promptly reports to his in office visits to his Parole Officer."  He states that he lived around K.S. "for nearly 1 year, without incident."

Plaintiff states that sometime between September 9, 2015, and September 19, 2015, Defendant Caudill spoke with Probation Officer Boucher.  According to Plaintiff, his probation officer informed Defendant Caudill that "there is no compelling reason from the Parole Officer's point of view of [Plaintiff] not to be around children or to raise his own child, to care for his own child.  Upon information and belief that it is conducive to prevention of [Plaintiff] having a relapse, and committing another offense."  Plaintiff represents that on September 15, 2015, he had a conversation with Defendant Caudill during which Defendant Caudill "confirmed 'a no compelling reason' for her justification of removing [K.S.] from the home."

Plaintiff states that on September 21, 2015, "[t]he Defendants then arbitrarily change course" and modified the Plan.  This new Plan limited Plaintiff's visitation to three hours three days per week.  It also directed that visitation was to take place in a public place.  According to Plaintiff, sometime in November or December, his wife "decided to leave the home, and move to Henderson away from her husband, due to her being pregnant with a second child and experience duress from the hands of CPS."  Plaintiff states that thereafter, "Defendants then arbitrarily change course yet again, that now the parents would have different schedule visit times with their child . . . ."

3

Plaintiff alleges a Fourteenth Amendment substantive due process claim.  He asserts that he has a fundamental liberty interest "in his marital relationship and his ability to live with his wife and/or with his child as a family unit.  The defendants' restriction of contact with [K.S.] (based sole on [Plaintiff's] past criminal conviction), substantially infringed upon this interest." Plaintiff alleges a First Amendment freedom of association claim.  Plaintiff states that he has a fundamental right "to sustain his marriage, to live with his wife, and his son, and to raise, educate, and build a relationship, and bond with his son.  The defendants' restrictions of [Plaintiff's] contact with [K.S.] substantially infringed upon this interest."  Plaintiff also alleges a violation of procedural due process.  According to Plaintiff, "[d]ue process required timely and adequate notice detailing the Defendants' reasons for imposing the 'restrictions' of this condition placed on [Plaintiff], as well as a meaningful opportunity for [Plaintiff] to challenge the imposition of the condition."

As relief, Plaintiff seeks monetary damages, injunctive relief, declaratory relief, and costs and attorney fees.  The declaratory relief he seeks is for this Court to declare the restrictions by Defendants placed upon his contact with K.S. as unconstitutional.  The injunctive relief he seeks is for this Court to issue a permanent injunction "barring enforcement of any condition that restrict [Plaintiff's] contact with his biological son in any shape fashion or form . . . ."

In support of his claims, Plaintiff has attached various state court documents to his complaint as exhibits.[1]  The Court will briefly summarize these documents.  Three Prevention Plans are attached to the complaint.  One is dated September 2, 2015; one is dated September 21, 2015; and the third is undated.  Also attached is a September 22, 2015, Juvenile Dependency,

---

[1] The Court notes that Plaintiff has attached a notice of removal of his state family court case to the United States District Court (DN 1-2, p. 10).  A separate action regarding this removal has been opened in this Court.  *See Commonwealth of Ky. v. Stone*, Civil Action No. 4:16CV-67-JHM .

Neglect and Abuse Petition against Plaintiff and his wife which was filed in Webster County

Family Court. Therein, Defendant Caudill affirmed as follows:

> On 7/6/15, DCBS received a referral that the Stone residence had cat and dog feces throughout the home with an odor that is indescribable. There were also concerns with the child having an ongoing diaper rash and a playpen that was broken that he slept in. SSW Campbell investigated this referral and upon arriving at the residence both Kenneth and Brittany were at a family members residence nearby on the front porch while they left their child inside their residence in the playpen. SSW Campbell observed large amounts of dog feces all over the home. The family put newspaper down in the back bedroom (where [K.S.'s] crib is located) and allowed the dogs to use the bathroom in there for approximately one week while they were gone. The dogs also used the bathroom in other rooms of the home and the floor was sticky with feces and urine when SSW walked through the residence. There was a cat litter box next to kitchen door that was full of cat excrement and obviously had not been cleaned in some time. There were dirty dishes in the sink with spoiled food on them, there were also dirty dishes covering the kitchen table. There was trash on the floor next to the kitchen door and 2 small dogs and a cat that were living in the home. The home is older and not well maintained. There is one room that is closed off and has a master lock on the outside of it. SSW Caudill asked to see what was inside the bedroom; there were pieces of ceiling falling down with black mold believed to be around the holes. Additionally there was a snake skin hanging down from one of the holes in the ceiling. There was trash, clutter, and multiple bird cages that were in the room; which was reported to all be Brittany's aunt's items. The family does not take their trash off on a regular basis and it is piled up behind the residence.

> When SSW Campbell received the family's background checks it was found that Kenneth Stone J. is a lifetime registered sex offender due to charges that involved his seven year old nephew. A referral regarding Kenneth's background check and concerns about Brittany's level of functioning was accepted. It is believed the child is a neglected child based upon the above factors.

On or about December 14, 2015, a temporary removal hearing was held. A temporary

removal order was entered the following day. The child, K.S., was removed from the custody of

his parents based "on the unsanitary conditions of the home" and placed in the temporary

custody of his paternal grandmother. It was ordered that all visits be supervised. It appears that

a disposition hearing was held on May 9, 2016. The findings of the family court are as follows:

the Court [found] by a "preponderance of the evidence neglect/abuse with both mother and father as persons responsible given the hazardous state of the home-feces, mold, urine, and other hazardous conditions; the father's account of the reasoning for the home's state is not found to be plausible and the court cannot give weight to said testimony; the testimony of other witnesses called by the parents had not relevant testimony regarding the condition of the home at the time of the offending conditions were present; Court further finds the child at ROH given that the father is a registered sex offender of with a 7 year old male victim and several convictions for violations of his probation and the mother's observed deficient abilities in her interaction with DCBS that she would not be able to protect the child from the father; also neither parent disclosed the conviction to DCBS[.]

On May 26, 2016, the family court entered a disposition hearing order ordering that K.S. remain out of the home due to "neglect based upon environmental concerns within the home." The court ordered that Plaintiff was to have no unsupervised contact with K.S. or any child under the age of 18. The order further directed Plaintiff to complete a parenting class; to "demonstrate the skills learned; to abide by all requirements of the Sex Offender Registry"; and to utilize the information he learned from the SOTP.

## II.

Although this Court recognizes that *pro se* pleadings are to be held to a less stringent standard than formal pleadings drafted by lawyers, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Jourdan v. Jabe*, 951 F.2d 108, 110 (6th Cir. 1991), "[o]ur duty to be 'less stringent' with pro se complaints does not require us to conjure up unpled allegations." *McDonald v. Hall*, 610 F.2d 16, 19 (1st Cir. 1979) (citation omitted). This Court is not required to create a claim for Plaintiff. *Clark v. Nat'l Travelers Life Ins. Co.*, 518 F.2d 1167, 1169 (6th Cir. 1975). To command otherwise would require the Court "to explore exhaustively all potential claims of a *pro se* plaintiff, [and] would also transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

6

Rule 12(h)(3) of the Federal Rules of Civil Procedure provides, "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  It is axiomatic that federal district courts are courts of limited jurisdiction, and their powers are enumerated in Article III of the Constitution.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *Hudson v. Coleman*, 347 F.3d 138, 141 (6th Cir. 2003) ("[I]t is well established that federal courts are courts of limited jurisdiction, possessing only that power authorized by the Constitution and statute.").  "Jurisdiction defines the contours of the authority of courts to hear and decide cases, and, in so doing, it dictates the scope of the judiciary's influence."  *Douglas v. E.G. Baldwin & Assocs. Inc.*, 150 F.3d 604, 606 (6th Cir. 1998), *overruled on other grounds by Cobb v. Contract Transp., Inc.*, 452 F.3d 543, 548-49 (6th Cir. 2006).  The party that seeks to invoke a federal district court's jurisdiction bears the burden of establishing the court's jurisdiction.  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. at 377.

## III.

Plaintiff's claims must be dismissed because this Court lacks subject-matter jurisdiction over this case.  Plaintiff requests the Court to declare the restrictions placed upon his contact with K.S. as unconstitutional and to bar "enforcement of any condition that restrict [Plaintiff's] contact with his biological son in any shape fashion or form . . . ."  While couching his complaint as alleging violations of his constitutional rights, Plaintiff is actually challenging the state family court's child custody proceeding.  *See Partridge v. State of Ohio*, 79 F. App'x 844, 845 (6th Cir. 2003) (finding that while plaintiff "attempts to assert civil rights claims, he essentially raises domestic relations issues by challenging Ohio court child custody and divorce decisions").  However, federal courts do not have jurisdiction to resolve domestic-relations matters.

7

*Ankenbrandt v. Richards*, 504 U.S. 689, 703 (1992); *Catz v. Chalker*, 142 F.3d 279, 290 (6th Cir. 1998); *Kelm v. Hyatt*, 44 F.3d 415, 420 (6th Cir. 1995).

The Sixth Circuit discussed the domestic-relations exception in two recent cases, *Alexander v. Rosen*, 804 F.3d 1203 (6th Cir. 2015) and *Chevalier v. Estate of Barnhart*, 803 F.3d 789 (6th Cir. 2015).  The Sixth Circuit clarified that the domestic-relations exception applies only to a "narrow range" of cases, *Chevalier v. Estate of Barnhart*, 803 F.3d at 795, and it does not apply "unless 'a plaintiff positively sues in federal court for divorce, alimony, or child custody,' or seeks to modify or interpret an existing divorce, alimony, or child-custody decree" *Chevalier v. Estate of Barnhart*, 803 F.3d at 796 (quoting *Catz v. Chalker*, 142 F.3d at 292). "When analyzing the applicability of the domestic-relations exception, we must focus on the remedy that the plaintiff seeks:  Does the plaintiff seek an issuance or modification or enforcement of a divorce, alimony, or child-custody decree?" *Id.* at 797.

In *Alexander v. Rosen*, the plaintiff claimed that a federal judge, a Michigan family court judge, and several state administrative employees conspired against him in imposing a child support award against him.  *Alexander v. Rosen*, 804 F.3d 1203.  The Sixth Circuit held therein that the domestic-relations exception did not apply to the claims "because [the plaintiff] does not request that we issue a 'divorce, alimony, or child custody' decree or that we 'modify or interpret an existing' decree." *Id.* at 1205.  Further, the Sixth Circuit found:

> [The plaintiff] instead requests that we apply federal law to determine whether the officials overseeing his child support case conspired against him—an inquiry that does not require us to apply Michigan child custody law, question the state's calculation of child support payments, or otherwise address the merits of the underlying dispute.  We may thus resolve [the plaintiff's] claims without entangling ourselves in difficult questions of state family law, which is what the domestic relations exception was designed to prevent.

*Alexander v. Rosen*, 804 F.3d at 1205-06 (citing *Ankenbrandt v. Richards*, 504 U.S. at 703-04).

8

Turning to the relief sought by Plaintiff in the instant case, he requests this Court to "[i]ssue a permeant injunction barring enforcement of any condition that restrict [Plaintiff's] contact with his biological son in any shape fashion or form" and to "[d]eclare that the Defendants' restriction on [Plaintiff's] contact with [K.S.] is and/or was unconstitutional."  To award such relief would require this Court to entangle itself in questions of state family law. This Court would have to apply Kentucky child custody law, question the state family court's custody determinations, and address the merits of that state family court's determination of neglect.  These considerations are what the domestic-relations exception was designed to prevent.  *See Chevalier v. Estate of Barnhart*, 803 F.3d at 794 ("[T]here are sound policy reasons to leave the issuance of divorce, alimony, and child-custody decrees to the state courts.").  The Court therefore concludes that the domestic-relations exception applies to this case, and the case must be dismissed.

Furthermore, while it is unclear in the complaint whether the state-court custody proceeding is still pending, this Court may not make a determination of Plaintiff's custody status in either event.  To the extent that Plaintiff seeks this Court's involvement in any on-going child custody proceeding, the doctrine of abstention pursuant to *Younger v. Harris*, 401 U.S. 37 (1981), "requires a federal court to abstain from granting injunctive or declaratory relief that would interfere with pending state judicial proceedings."  *O'Neill v. Coughlan*, 511 F.3d 638, 643 (6th Cir. 2008).  Here Plaintiff seeks injunctive and declaratory relief.  The Sixth Circuit has enunciated three factors used to determine whether to abstain from hearing a case pursuant to *Younger*:  "(1) there must be on-going state judicial proceedings; (2) those proceedings must implicate important state interests; and (3) there must be an adequate opportunity in the state proceedings to raise constitutional challenges."  *O'Neill v. Coughlan*, 511 F.3d at 643.

Assuming that there is an on-going judicial proceeding, the Sixth Circuit has recognized that the realm of domestic relations is an important state interest. *Kelm v. Hyatt*, 44 F.3d at 420 ("These traditional domestic relations issues qualify as important state issues under the second element of *Younger*.").  Further, Plaintiff has an adequate opportunity in the state proceeding to raise any constitutional challenges, as nothing bars him from appealing a family court order or judgment to the Kentucky Court of Appeals.  Therefore, abstention is proper in this case.

To the extent that a final custody decree has been entered by the state family court, under the *Rooker-Feldman* doctrine, a federal district court may not hear an appeal of a case already litigated in state court.  "A party raising a federal question must appeal a state court decision through the state system and then directly to the Supreme Court of the United States." *United States v. Owens*, 54 F.3d 271, 274 (6th Cir. 1995) (citing *Dist. of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983) and *Rooker v. Fid. Tr. Co.*, 263 U.S. 413 (1923)).  Therefore, to the extent that Plaintiff is challenging the state court's decision regarding the custody and visitation of his child, the *Rooker-Feldman* doctrine bars such a claim.

Accordingly, this action must be dismissed for lack of subject-matter jurisdiction.  The Court will enter a separate Order dismissing the action and denying all pending motions as being moot.

Date: September 8, 2016

**Joseph H. McKinley, Jr., Chief Judge**
**United States District Court**

cc:     Plaintiffs, *pro se*
        Defendants
4414.003